**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

| | |
|---|---|
| Melanie Glasser, individually and on behalf of all others similarly situated, | Case No. 8:16-cv-00952-JDW-UAM |
| Plaintiff, | |
| vs. | |
| Hilton Grand Vacations Company, LLC | |
| Defendant. | |

**DEFENDANT, HILTON GRAND VACATIONS COMPANY, LLC'S MOTION TO
DISQUALIFY PLAINTIFF'S EXPERT WITNESS, RANDALL A. SNYDER, AND TO
DISQUALIFY PLAINTIFF'S COUNSEL OF RECORD**

Defendant, Hilton Grand Vacations Company, LLC ("Hilton"), by and through its

undersigned attorneys, file this Motion to Disqualify plaintiff Melanie Glasser's ("plaintiff")

expert witness and consultant, Randall A. Snyder, and plaintiff's attorneys of record, Keogh Law,

Ltd., and The Consumer Protection Firm ("Plaintiff's counsel"), from participation in this action

in light of Mr. Snyder's and plaintiff's counsel's receipt of Hilton's confidential information.

The requested relief is based on this Motion, the Memorandum of Legal Authority that

follows, the Declarations that follow, and all prior pleadings and proceedings in this action, as

well as all matters of which the Court may take judicial notice.

/ / /

/ / /

I.   **I**NTRODUCTION

Plaintiff and her counsel have deliberately retained an expert who was retained by Hilton in nearly identical litigation and with whom Hilton consulted in confidence regarding the very dialing systems, policies and procedures, and issues involved in this case. Knowing that Mr. Snyder was retained by Hilton in *Connelly et al. v. Hilton Grand Vacations Company, LLC*, Case No. 12-cv-0599 (2012) ("*Connelly*")—a nearly identical lawsuit currently pending before the Ninth Circuit—and knowing that Mr. Snyder was privy to Hilton's confidential information and its defense strategies relating to the TCPA, plaintiffs' counsel pursued and retained Mr. Snyder to assist plaintiff in this case. Not only did Plaintiff's counsel knowingly misappropriate Mr. Snyder while *Connelly* remains pending, they did so notwithstanding the fact that Hilton had continued to have confidential consultations with him into July 2015 regarding the very dialing systems at issue in this case. Plaintiff's counsel thereby obtained Hilton's confidences, and are attempting to use these confidences to Hilton's detriment, in violation of the Florida Rules of Professional Conduct, the Local Rules of this District, and national ethical standards of professional responsibility.[1] Hilton therefore brings this motion to disqualify Mr. Snyder from serving as plaintiff's expert in this case, and further moves to disqualify plaintiff's counsel. An order of disqualification of both expert and attorney is required to protect the integrity of this proceeding moving forward.

---

[1] In discussing generally the confidential information disclosed to Mr. Snyder, Hilton in no way waives the protections of the attorney work product doctrine or any other protection regarding the confidentiality of such information and it expressly reserves all rights.

## II.   FACTUAL BACKGROUND

### A.    The *Connelly* Action

On March 9, 2012, plaintiffs Brian Connelly, Alicia Sikes, and Keith Merritt filed a lawsuit in the Southern District of California, alleging that Hilton had illegally placed automated phone calls to their cell phones in violation of the TCPA. Farkas Decl., ¶ 2, Exh. A. The *Connelly* plaintiffs made virtually identical allegations to those made in this lawsuit. *Compare Connelly* Complaint, Exh. A, ¶ 37 to *Glasser* Complaint [Dkt. No. 1]. The plaintiffs in both actions allege that Hilton's telemarketing practices violated the TCPA by placing calls with the use of automated equipment, both seek statutory damages and both allege that Hilton willfully violated the TCPA. The proposed class definitions in each case are virtually identical:

*Connelly*: "All persons within the United States to whom Hilton Grand Vacations has placed a call to said persons' cellular telephone (without their prior express consent and not for emergency purposes) through the use of an automatic telephone dialing system, within the four years prior to the filing of this Complaint." Exh. A, ¶ 17.

*Glasser*: "(1) All persons in the United States (2) to whose cellular telephone number Defendant placed a telephone call (3) promoting the sale of its vacation packages or time shares (4) using substantially similar dialing system(s) that called Plaintiff or an artificial or prerecorded voice (5) on or after October 16, 2013 (6) without that person's signed, written agreement authorizing Defendant to initiate automated or prerecorded telemarketing calls to that number." [Dkt. No. 1], ¶ 37.

Hilton retained Mr. Snyder as a consulting expert in *Connelly* in August 2012. Farkas Decl., ¶ 3. During the course of his engagement, Mr. Snyder spent significant hours reviewing hundreds of pages of documents, summaries, reports, and other items provided to him and

carefully presented by Hilton, and Hilton's counsel, Liner LLP ("Liner"). *Id*. Some of these reports and materials were prepared by Hilton, and/or by Hilton with Liner's assistance, specifically for review by Mr. Snyder. *Id*. Mr. Snyder worked closely with Hilton and Liner to develop case strategies, prepare for and guide Hilton's defenses, review Hilton's policies and procedures relating to its compliance with the TCPA, discuss and review Hilton's internal telemarketing practices and systems, including but not limited to its dialing systems, and ultimately, prepare a report delineating his opinion on whether Hilton was in compliance with the TCPA. *Id*. Mr. Snyder was paid thousands of dollars by Hilton for his expert services. *Id*.

On July 12, 2013, Mr. Snyder was designated as Hilton's expert in *Connelly*. *Id*. ¶ 4. He was prepared to "testify concerning telecommunications network and system architecture, engineering, design and technology as well as the fields of wireline and cellular telecommunications networking technology . . ." and, "to testify concerning the practices, systems and equipment used by [Hilton] . . ." and, "to determine whether the equipment employed by [Hilton] has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator; whether [Hilton], in fact, used such equipment; whether [Hilton] employed equipment that has the capacity to dial cellular telephone numbers without human intervention; and whether [Hilton], in fact, dialed cellular telephone numbers without human intervention." *Id.*, Exh. B.

About one month later, Mr. Snyder prepared a robust, written report for Hilton, wherein he stated he was retained to, "provide [his] expert opinions relating to technology described within the Telephone Consumer Protection Act, 47 U.S.C. § 227, et seq. ("TCPA") and the claims by Plaintiff that [Hilton] maintains an Automatic Telephone Dialing System ("ATDS") as defined in the TCPA." *Id.*, ¶ 4.

On October 1, 2013, Mr. Snyder's deposition was taken in *Connelly*. *Id.*, ¶ 5. Prior to the deposition, Mr. Snyder conferred numerous times with Liner attorneys to prepare for the same. *Id.* During their many conferences, Hilton's counsel and Mr. Snyder discussed Hilton's defenses against the alleged TCPA violations, shared ideas on how Mr. Snyder's prior reports would be attacked, shared ideas on the strengths of Hilton's practices, discussed Hilton's telemarketing systems and campaigns in great detail, discussed strengths and weaknesses of the *Connelly* plaintiffs' expert report, discussed likely areas of cross examination, reviewed Hilton's other consulting expert's report, and discussed how certain evidence applied to certain case issues. *Id.* Mr. Snyder has since listed his retention in Connelly on his CV, and has posted that CV publicly on the internet. *Id.*

Later that month, after Hilton prevailed in its motion to defeat class certification in *Connelly*, the case was voluntarily dismissed and plaintiffs took an immediate appeal. *Id.*, ¶ 6. *Connelly* remains pending on appeal before the United States Court of Appeal for the Ninth Circuit; and, if the challenged class certification ruling is reversed, the action will be remanded for continued litigation. <u>Mr. Snyder is still Hilton's designated expert in *Connelly*</u>. *Id.*[2] In fact, Hilton anticipates that if *Connelly* were remanded, the Connelly plaintiffs would argue that the class period in that case would extend from 2009 *through the present*, thereby overlapping with the proposed class in this case. In light of plaintiff's knowing and deliberate retention of Mr. Snyder, Hilton will likely be unable to utilize Mr. Snyder's services in *Connelly*, and will therefore be severely prejudiced no matter the outcome of this motion.

---

[2] Mr. Snyder continued to have occasional e-mail and telephonic communications with Liner attorneys regarding legal developments relating to the TCPA and defense strategies regarding same through 2014. *Id.*

**B.**      <u>**Subsequent Consultation With Mr. Snyder in 2015**</u>

In July 2015, while *Connelly* remained pending before the Ninth Circuit, Hilton, through David B. Farkas, Esq., of Liner, continued to confidentially discuss its telemarketing systems and legal strategies with Mr. Snyder. *Id.*, ¶ 7. Such discussions were relevant to *Connelly* as well as Hilton's continual efforts to ensure compliance with the TCPA and with newly promulgated FCC regulations in 2015. *Id.* Although this action had not yet been filed, Mr. Farkas's discussions with Mr. Snyder directly related to the dialing systems and other telemarketing practices Hilton used during the proposed class period at issue here and the potential changes to those systems and practices. *Id.*

On July 14, 2015, Mr. Farkas called Mr. Snyder and left him a voicemail message regarding ongoing and further consulting for Hilton. *Id.*, ¶ 8. Mr. Snyder received that message and responded to Mr. Farkas in writing by e-mail the following day. *Id.* Mr. Snyder and Mr. Farkas then engaged in at least two telephone conferences on July 15, 2015, which together lasted at least forty-five minutes. *Id.* During the telephone conferences, Mr. Farkas and Mr. Snyder discussed the new FCC regulations in great detail, Hilton's dialing system, Hilton's potential transition to a new dialing system, the legal and strategic considerations involved in those decisions, and other aspects of Hilton's telemarketing practices and legal strategies vis-à-vis the TCPA. *Id.* They also discussed Hilton's continuing compliance with the TCPA, and how Hilton's systems were being configured and used. *Id.* Mr. Farkas also imparted his impressions and conclusions regarding his interpretation of the new regulations, and how they applied specifically to Hilton. *Id.* He requested Mr. Snyder's impressions as well. *Id.*

Mr. Snyder then sent Mr. Farkas an e-mail summarizing the points of their discussion and rendering a professional opinion. *Id.* ¶ 9. Mr. Snyder then provided Mr. Farkas with the names of

specialized audit firms and the new FCC regulations, sending two e-mails to him on July 16, 2015 and July 22, 2015. *Id.*

Only July 30, 2015, Mr. Farkas followed up with Mr. Snyder:

> "Thanks very much for this. I also wanted to touch base again with you regarding a potential engagement for an onsite evaluation of Hilton's systems in Orlando. My client is very interested in getting your evaluation and assessment of the system. While I understand that you believe there is little that can be done proactively and preemptively to ensure compliance with the FCC's recent ruling, Hilton wants to take every possible step to ensure that their systems and processes are in compliance. That would include your evaluation and assessment, and your identification of any potential weaknesses. If you have any time, could we have a quick call to discuss if you are available for this type of engagement?" *Id.*

Mr. Snyder replied to Mr. Farkas's e-mail on August 3, 2015, stating that he does not typically provide the services sought by Hilton. *Id.*

### C.   <u>Plaintiff's Knowing and Deliberate Retention of Mr. Snyder</u>

On or around March 15, 2017, Hilton learned that plaintiff had retained Mr. Snyder as a consulting (and potential testifying) expert in this litigation. Agrusa Decl., ¶ 2. Hilton was shocked to discover plaintiff's retention of Mr. Snyder, in light of plaintiff's explicit acknowledgment of *Connelly* in the Complaint in this action, and the fact that Mr. Snyder's CV conspicuously lists his retention in *Connelly*. *See* Farkas Decl., ¶ 3, Exh. A, ¶ 12. Despite that plaintiff was aware of Mr. Snyder's retention in *Connelly*, and that she or her counsel were aware that *Connelly* remains pending before the Ninth Circuit, her retention of Mr. Snyder in this case appears to be a deliberate attempt to obtain confidential information regarding Hilton's telemarketing practices, and its strategies, impressions, and legal positions as relates to the TCPA.

Immediately upon discovery of plaintiff's retention of Mr. Snyder, Ms. Agrusa wrote to

Plaintiff's counsel on March 17, 2017, requesting that plaintiff's counsel withdraw Mr. Snyder

and cease any further communication with him:

> We were shocked to learn that you have retained Randall Snyder as a consulting and potential testifying expert in this matter. As you know, Hilton retained Mr. Snyder in the Connelly action, and during Mr. Snyder's retention in Connelly, he has been privy to highly confidential information regarding Hilton's systems, policies, and practices as well as its counsel's theories, strategies, mental impressions, and work product. Moreover, my firm had extensive discussions with Mr. Snyder in the summer of 2015 regarding his potential evaluation of the IMC system and exploration of potential changes to Hilton's systems, policies, and practices with respect to its telemarketing campaigns, during which once again, Hilton disclosed confidential information to Mr. Snyder.
>
> In light of the foregoing, please immediately cease any contact with Mr. Snyder and confirm that you are voluntarily terminating your relationship with him. *See, e.g., Rhodes v. E.I. Dupont De Nemours and Company*, 558 F. Supp. 2d 660, 671 (S.D. W.Va. 2008). As well please advise whether your firms are prepared to withdrawal voluntarily in light of their receipt of Hilton's confidential information.

Agrusa Decl., ¶ 4, Exh. Plaintiff's counsel cavalierly responded to Ms. Agrusa, stating, "[t]he

Lady doth protest too much" and Hilton's request was summarily refused in the ensuing e-mail

chain. Agrusa Decl., ¶ 4, Exh. C. Despite being on notice of Mr. Snyder's possession of Hilton's

confidential information, plaintiff's counsel has still refused to cease communications with Mr.

Snyder. *Id*.

### D.   Plaintiff's Red Herring: Hilton's October 2013 Change in Dialing Systems

Plaintiff's apparent rationale in refusing to withdraw Mr. Snyder as an expert in this

matter is that Hilton changed dialing systems in or around October 2013. Plaintiff reasons that

any confidential information Mr. Snyder acquired—and by extension the confidential

information plaintiff's attorneys acquired—is therefore irrelevant to this lawsuit.[3] This is untrue

---

[3] To the extent that there is any question regarding the confidential nature of Hilton's communications with Mr. Snyder, and if the Court is inclined, Hilton is prepared to provide the

for several reasons. First, Hilton shared more than information regarding its dialing systems with Mr. Snyder. During more than a year-long period from Mr. Snyder's retention through the certification hearing in *Connelly* (and in communications following that hearing), Hilton and its counsel, Liner, shared legal strategies, impressions, and other confidential work product with Mr. Snyder regarding Hilton's defense of TCPA lawsuits, its telemarketing practices beyond its dialing systems, and its diligent efforts to comply with the TCPA. This confidential information is equally relevant to this lawsuit, and plaintiff and her counsel have now improperly obtained access to Hilton's legal strategies and its attorneys' mental impressions regarding the defense of Hilton and its telemarketing practices.

Second, Mr. Snyder was exposed to far more than merely technical information regarding Hilton's dialing systems. He obtained confidential information regarding the ways in which Hilton structures its marketing program, its efforts to comply with the TCPA, and the interrelationship between its landline and cellular marketing campaigns and its methods of scrubbing such numbers.[4] In fact, Mr. Snyder continued to have confidential e-mail and telephonic communications with Hilton's counsel after Hilton gradually rolled out its new dialing system in 2013.

Third, the fact that *Connelly* could potentially be remanded by the Ninth Circuit with ongoing litigation puts Hilton in an impossible situation. If *Connelly* is litigated in the District Court, plaintiff has effectively negated Hilton's ability to use Mr. Snyder as its expert, despite

---

Court with an *in camera* inspection of the written communications and a further *in camera* explanation of its confidential oral communications with Mr. Snyder.

[4] With regard to Hilton's telemarketing practices and compliance with the TCPA, Mr. Snyder concluded as follows: "I have personally never studied, analyzed or reviewed a call center operation that is as diligent as Hilton to ensure that cellular numbers are not called in any type of automated fashion." Farkas Decl., ¶ 4.

the significant investment Hilton made in retaining him. Moreover, to the extent the Connelly plaintiffs argue that their class extends to the present day, Hilton will be in the impossible position of defending itself against an expert who is providing an opinion in favor of a portion of the class and against another portion of the class. Plaintiff's knowing and deliberate retention of Mr. Snyder has tainted not just this matter but *Connelly* as well. In fact, the rules governing *ex parte* communications with the other party's expert will result in the impossible situation of Hilton being precluded from contacting its *own expert* in *Connelly*.

Finally, plaintiff ignores the additional communications that Hilton had in 2015 with Mr. Snyder regarding an evaluation of Hilton's then-current dialing systems and its plan to potentially migrate to a new system. Once again, during those communications, Hilton's counsel shared confidential information with Mr. Snyder regarding their legal strategies relating to the TCPA, the FCC's rulings, the interrelationship between the TCPA and Hilton's systems and planned change in systems, and the types of potential systems Hilton was considering purchasing. These conversations contained Hilton's counsel's work product and confidential mental impressions regarding the very dialing systems at issue in this case.

## III.   MR. SNYDER SHOULD BE DISQUALIFIED

### A.   The Court has the Power to Disqualify Mr. Snyder

Federal courts have the inherent power to disqualify a party's expert. *Grant Thornton, LLP v. FDIC*, 297 F.Supp.2d 880, 882 (S.D.W. Va.2004) (citing *Koch Refining Co. v. Boudreaux M/V*, 85 F.3d 1178, 1181 (5th Cir. 1996); see also, *Rhodes v. E.I. Du Pont De Nemours and Co.*, 558 F. Supp. 2d 660 (2008). This power exists in furtherance of the judicial duty to protect the integrity of the adversary process and to promote public confidence in the

fairness and integrity of the legal process." *Wang Labs., Inc. v. Toshiba Corp.*, 762 F. Supp. 1246, 1248 (E.D.Va.1991).

      **B.**     **The *Wang Labs.* Test is Satisfied**

      The test for disqualification as adopted by a majority of jurisdictions is set forth in *Wang Labs.*, which was before the Federal Court for the Eastern District of Virginia. The court proffered a two-prong test, which provides, "disqualification of an expert is warranted based on a prior relationship with an adversary if (1) the adversary had a confidential relationship with the expert and (2) the adversary disclosed confidential information to the expert that is relevant to the current litigation." *Wang Labs.*, 762 F. Supp. at 1248. The court must also evaluate the policy considerations both in favor or, and against disqualification. *Koch Refining*, 85 F.3d at 1182

      In the wake of *Wang Labs.*, disqualification of an expert was found appropriate where a party retains an expert who previously worked for an adversary and received confidential information from the first client. *See Erickson v. Newmar Corp.*, 87 F.3d 298, 300 (9th Cir.1996) (acknowledging that in a "switching sides" case, the "court may grant the original hiring party's motion to disqualify the expert when it is determined that the expert is in possession of confidential information received from the first client."); *Lacroix v. BIC Corp.*, 339 F. Supp. 2d 196, 199 (D. Mass. 2004); *see also Cordy*, 156 F.R.D. at 581 (ruling that disqualification of an expert was proper where the affected party informed the expert of their theory of the case, certain targeted defendants, grouping of documents, and mental impressions).

      **1.**     **There was a Confidential Relationship**

      Under the <u>first</u> prong of the two-prong test, it is without question that Hilton has acted reasonably in assuming that a confidential relationship existed (and continued to exist) between it, its attorneys, and Mr. Snyder. As previously discussed, Mr. Snyder was retained and

designated by Hilton in *Connelly*, which is a TCPA class action lawsuit involving nearly identical issues and allegations, and potentially an overlapping class. For over a year, Mr. Snyder was effectively entrenched with Hilton's counsel, learning confidential information regarding Hilton's systems, its policies, its legal strategies regarding the TCPA, and its attorneys' mental impressions.

Mr. Snyder also further consulted with Hilton's counsel in 2015 regarding issues directly relevant to the Glasser Action. Farkas Decl., ¶¶ 7-10. As evidenced through the e-mail correspondences between Mr. Snyder and Mr. Farkas, the prior engagement pertaining to *Connelly* was readily identified between the two, as was Liner's ongoing engagement of Mr. Snyder. *Id*. Mr. Snyder and Mr. Farkas engaged in at least two telephone conferences lasting a total of more than forty-five minutes and several e-mails. *Id*. That consultation was an evaluation of Hilton's then-current dialing system—the IMC system—and the possibility that Hilton would transition to a new dialing system. During those conversations, Hilton's counsel shared confidential legal strategies and analyses regarding the FCC's recent rulings, Hilton's ongoing efforts to comply with the TCPA and with applicable FCC rulings, and the evaluation of potential options for a new dialing system. *Id*. Those conversations, and the confidential information Hilton's counsel shared, are directly relevant to the issues in this lawsuit. Therefore, it was eminently reasonable for Hilton and Liner to assume that Mr. Snyder's relationship was of a confidential nature, even continuing into 2015.

As noted in *Koch Refining*, courts have held that a confidential relationship existed even where there was no formal retention of the expert by the party (confidential relationship found where "the record supports a longstanding series of interactions, which have more likely than not coalesced to create a basic understanding of [the retaining party's] modus operandi, patterns of

operations, decision-making process, and the like"). See *Koch Refining*, 85 F.3d at 1182 (quoting *Marvin Lumber Cedar Co. v. Norton Co*., 113 F.R.D. 588 (D.Minn.1986). In this case, where there was an actual engagement for services, it is clear that such a confidential relationship existed at all relevant times.

### 2.      Confidential Information was Shared

Under the second prong, it is also without question that confidential information was conveyed to Mr. Snyder from 2012 to 2015. Without limitation, "[c]onfidential information is defined as information 'of either particular significance or [that] which can be readily identified as either attorney work product or within the scope of the attorney-client privilege,' including discussions of a party's 'strategy in the litigation,' a party's 'view of the strengths and weaknesses of each side,' and the 'role of each of [a party's] experts to be hired and anticipate defenses.'" *Kane v. Chobani, Inc.* (N.D. Cal., Aug. 2, 2013, No. 12-CV-02425-LHK) 2013 WL 3991107, at *5.

Given that Liner and Hilton's representatives worked closely with Mr. Snyder for nearly two years to develop case strategies, prepare and support Hilton's defenses, prepare him for his deposition, review Hilton's policies and procedures relating to its compliance with the TCPA, and discuss Hilton's telemarketing practices, this burden is also met. In fact, those very same impressions, strategies, defenses, telemarketing practices, ideas, and system configuration protocols are at the heart of the this case, which involves more than just the type of system Hilton uses, but also calls into question *how* Hilton uses it. Mr. Snyder even stated in his deposition in *Connelly*: "*You can't divorce the overall system from how it was configured and used.*" *Id.*, ¶ 5. Therefore, Hilton's systems and practices are truly a matter of "particular significance."

Mr. Snyder is also familiar with Liner's impressions, case strategies, and work product relating to Hilton's defense of TCPA class action lawsuits. *Id*., ¶¶ 3-10, Agrusa Decl., ¶ 2.This is one of many reasons why Mr. Farkas reached out to Mr. Snyder in 2015 for a further consultation, during which time Mr. Snyder was also made privy to confidential information pertaining to Hilton's then-current systems. Mr. Snyder even rendered preliminary opinion from the information obtained from Mr. Farkas. *Id*., ¶¶ 7-10.

Perhaps most importantly, Mr. Snyder was privy to confidential information that *no* other expert for Plaintiff would be able to obtain—specifically the litigation strategies of Liner and Hilton. Mr. Snyder received deposition preparation material, proprietary compilations of statistics and information that would otherwise constitute work product, and counsel's impressions of the relevant databases, practices, and technology at stake in this action. *In re Incretin Mimetics Products Liability Litigation,* No. 13MD2452 AJB MDD 2015 WL 1499167, at *6 (S.D. Cal., Apr. 1, 2015) ("Further, even if the particular data regarding Victoza that Dr. Fleming was privy to is now outdated, Novo's internal practices, policies, and strategies remain valuable information unobtainable by other experts.") In this case, Mr. Snyder is unequivocally possessed of confidential information, and the second prong of the *Wang Labs* test is met.

### 3.    Disqualification Will Not Run Contrary to Public Policy

Lastly, under the <u>third</u> prong courts have "balance[d] the competing policy objectives in determining expert disqualification…" with "policy objectives favoring disqualification [where the court seeks to prevent] conflicts of interest and [to maintain] the integrity of the judicial process." *Koch Refining*, 85 F.3d at 1182. In contrast, "[t]he main policy objectives militating against disqualification are ensuring that parties have access to expert witnesses who possess specialized knowledge and allowing experts to pursue their professional calling." *Id*. at 1183.

Other concerns examine whether unscrupulous attorneys may attempt to create an inexpensive relationship with harmful experts just to keep them from the opposing party, or whether another expert is available and whether the opposing party had time to engage him before trial. *Id.*

In this case, considerations of fundamental fairness militate towards disqualification. There is no genuine argument that Hilton or Liner created an inexpensive relationship with Mr. Snyder to preclude him from acting as Plaintiff's expert; nor is there a genuine argument that suitable experts in Mr. Snyder's field are far and few between. It would not be difficult for Plaintiff to hire another expert—specifically one who is not currently retained by the defendant she is suing.

Unlike Plaintiff, Hilton would suffer the most prejudice if Mr. Snyder is not disqualified. Apart from having possession of Hilton's confidential information and Liner's attorney work product, if Mr. Snyder is permitted to remain in this action, Hilton would be forced into the untenable position of both needing to *accredit* his first opinion in *Connelly*, while simultaneously needing to *discredit* his second opinion in this action. His two opinions relate to the same defendant and nearly identical operative issues, causes of action, sets of facts, and regulations. Moreover, plaintiff's retention of Mr. Snyder was deliberate. Plaintiff was aware of Mr. Snyder's retention in *Connelly*, having referenced that action in the Complaint and given that it has long been on Mr. Snyder's CV. Both Mr. Snyder, and particularly her counsel, should have tread with caution, because "[f]airness also requires that consultants with doubts about their desire to be retained should express these doubts clearly and unequivocally to the inquiring lawyer and decline to accept any disclosures unless and until the doubts are resolved." *Wang Labs.*, 762 F. Supp. at 1248-49.

Therefore, not only should Mr. Snyder be disqualified, but Plaintiff's counsel should be precluded from further communication with him, and use of any of the materials he has prepared.

## IV.   PLAINTIFF'S COUNSEL SHOULD ALSO BE DISQUALIFIED

When plaintiff's counsel sought to retain Mr. Snyder as an expert in this case, they were on notice that Hilton had already retained Mr. Snyder as its defense expert in *Connelly*. Given that *Connelly* and this case involve numerous overlapping facts and allegations pertaining specifically to Hilton, and given that Hilton is still represented by Liner, plaintiff's retention of Mr. Snyder to *prosecute* Hilton appears both deliberate and strategic. Plaintiff's counsel has disregarded the sanctity of Hilton's relationship with Mr. Snyder. Plaintiff's counsel has refused to confirm they will not use Mr. Snyder as an expert in this case or that they will cease communication with him. There is an ongoing threat of breach of confidences, which must be remedied by the court.

### 1.   Legal Standard

"The rules governing disqualification are designed to protect against the potential breach of such confidences, even without any predicate showing of actual breach. That is the case with respect to expert witnesses, just as it is the well accepted rule with respect to attorney disqualification. The threat or potential threat that confidences may be disclosed is enough." *Marvin Lumber Cedar Company v. Norton Company*, 113 F.R.D. 588, 591 (D. Minn. 1986) (citations omitted).

As it relates to litigation pending in the State of Florida, "[t]here are two sources for a court's authority when it considers a motion to disqualify an attorney. First, attorneys are bound by the rules of the court in which they appear . . ." and, "[s]econd, their professional conduct is

governed by federal common law, 'because motions to disqualify are substantive motions affecting the rights of the parties.'" *Herrmann v. Gutterguard, Inc., 199 F. App'x.* 745, 752 (11th Cir. 2006); *Blue Heron Beach Resort Developer, LLC v. Branch Banking and Trust Co.*, No. 6:13-CV-372-ORL-19, 2014 WL 644734 at *2 (M.D. Fla., Feb. 19, 2014). "Federal courts have inherent authority to discipline attorneys who appear before them for conduct deemed inconsistent with ethical standards imposed by the court." *In re Snyder*, 472 U.S. 634, 645 n. 6 (1985); *Board of Education of the City of New York v. Nyquist*, 590 F.2d 1241 (2d Cir. 1979) (Federal courts have power to disqualify attorneys in litigation pending before them where necessary to preserve the adversary process); *Hull v. Celanese Corporation*, 513 F.2d 568 (2d Cir. 1975) (District Court bears responsibility for the supervision of the members of its bar).

The United States District Court for the Middle District of Florida also provides in its local rules that attorneys admitted to practice before the Middle District are subject to Florida rules of professional conduct.[5]

### 2.    The Court May Apply Federal Law To Disqualify Plaintiff's Counsel

In *Cordy*, the court disqualified counsel where a former expert for plaintiff was later retained by defendant, and there was "sufficient doubt . . . as to the propriety of representation of [defendant]." 156 F.R.D. at 584. The court applied both federal and New Jersey State law, concluding that it would have reached its decision to disqualify under either framework. The relevant facts of *Cordy* are as follows: plaintiff's counsel had retained an expert in bicycle

---

[5] Pursuant to the Rules of the United States District Court for the Middle District of Florida, Rule 2.04, "[t]he professional conduct of all members of the bar of this Court, admitted generally under Rule 2.01 or specially under Rule 2.02, shall be governed by the Model Rules of Professional Conduct of the American Bar Association as modified and adopted by the Supreme Court of Florida to govern the professional behavior of the members of The Florida Bar." Both Keogh Law, Ltd., and The Consumer Protection Firm, fall within the ambit of Rule 2.04.

accident reconstruction. Plaintiff's counsel testified that he had provided the expert with confidential information, including a three-ring binder containing counsel's investigation, a cover letter with counsel's impression of the case, a police report, witness interviews, a summary memorandum, arranged photographs, and an engineering report prepared by another of plaintiff's experts. *Id*. at 577, 581. Plaintiff's counsel also testified that he had conversations with the expert, during time which he imparted his mental impressions, opinions, and theories of the case. *Id*. Later, the expert disengaged from plaintiff and was retained by defendant. *Id*. The court found that while some items provided to the expert were non-confidential, other items constituted protected attorney work product, including the arrangement of photographs, counsel's impressions, and counsel's theories. *Id*. at 581. During the time that the expert was retained by defendant, the court also found that "[t]here [was] no evidence that [the expert] directly imparted to [defendant's counsel] (or anyone else in her law firm or employed by her client) any of the information he learned from [plaintiff's counsel]." *Id*. at 579.  Notwithstanding, the court disqualified both the expert and the attorney.

In its ruling, the court found that where the *expert* received confidential information relating to the affected party, there was an appropriate presumption that such "confidences had passed to the [other side's] attorney." *Id*. 584. In reaching its conclusion, the court analogized the facts to an earlier federal court decision, *MMR/Wallace Power & Industrial, Inc. v. Thames Associates,* 764 F. Supp. 712 (D. Conn.1991), where defense counsel made unauthorized contact with an ex-employee of the plaintiff who had been a member of the plaintiff's litigation team. While the *MMR/Wallace* court applied a three-part test to determine whether to disqualify counsel, it only needed to answer the first question in the affirmative of whether the employee possessed confidential information. Since the employee was in possession of confidential

information, the court concluded that "a presumption arises that confidences, were, in fact, shared." *Id*. at 726.

Ultimately, the court in *Cordy* found defense counsels' conduct to be "wanting," and called into question the efforts they undertook to discover the true nature of the relationship between the expert and the adverse party. The court noted that ("[a]lthough [the expert] and defense counsel deny that he ever divulged it to his new employer, their protestations are unavailing;" "[d]efense counsel did nothing to discover the real nature of the relationship between [the expert] and [plaintiff's counsel]. Whether they chose to ignore warning signs or actually encouraged [the expert's] misconduct need not be decided. Defense counsel's conduct was wanting." *Cordy*, 156 F.R.D. at 584.[6]

Plaintiff's counsel's conduct in this case appears far more "wanting" than the conduct described in *Cordy*. Plaintiff's counsel were well aware that Mr. Snyder was retained as Hilton's expert in *Connelly*. In fact, the relationship was openly listed on Mr. Snyder's CV on his website. Farkas. *Id*., ¶ 3. Likewise, having referenced *Connelly* in the Complaint, and alleged judicial admissions made by Hilton in that case, plaintiff's counsel were likewise aware that Connelly remains pending before the Ninth Circuit. Plaintiff's counsel's retention of Mr. Snyder is therefore alarming. They apparently made no effort whatsoever to determine whether Mr. Snyder was in possession of Hilton's confidential information. In fact, in light of his retention by Hilton in *Connelly*, plaintiff's counsel's subsequent retention of Mr. Snyder appears to be a deliberate tactic to coopt an expert with confidential information regarding Hilton's systems, policies and

---

[6] Citing *MMR/Wallace*, the *Cordy* court noted that "[a]t the very least, defense counsel should have contacted Plaintiff's counsel to find out what their relationship was with the ex-employee 'before offering him a consulting contract." *Cordy*, 56 F.R.D. at 584. Likewise here, plaintiff's counsel made no effort to determine whether Mr. Snyder had obtained confidential information.

practices, and its counsel's mental impressions, strategies, and litigation plans relating to TCPA lawsuits.

Even if the Court ignores these strong indicia of intent, however, as shown in *Cordy*, the Court did not need decide whether the conduct was intentional; it is enough that the conduct created "sufficient doubt as to the propriety of the representation," and that principals of fairness dictated that "it [was] not sufficient simply to disqualify the expert to deter such conduct in the future…[but that] Counsel must also understand they are at some risk should they encourage (or fail to discourage) this kind of behavior." *Id.*

Even more disconcerting is the fact that no efforts were made by Plaintiff's counsel to inquire with Hilton or Liner whether Mr. Snyder, given his past relationship with Hilton, *could* be retained by Plaintiff. Agrusa Decl., ¶ 3. Instead of doing so, they kept the fact of Mr. Snyder's retention a secret until such time they presented his preliminary report to Hilton's counsel. *Id.* And, since Mr. Snyder has already apparently reviewed this matter in great enough detail to prepare a written report, it is already clear plaintiff's counsel has been exposed to Mr. Snyder's potential use of confidential information from Hilton and Liner. *Id.* As the *Cordy* court noted, it would be incredible to believe that "[the expert] did not and will not remember and ultimately use that information, even 'subliminally'" and applied the same presumption that confidences had passed from expert to attorney. *Cordy*, 156 F.R.D. at 584 (citing, *Michelson v. Merrill Lynch Pierce Fenner & Smith* 83 Civ. 8898, 1989 WL 31514, *3 (S.D.N.Y)).[7]

---

[7] The notion that an expert is unable to compartmentalize his or her knowledge is shared by many courts. *See Kane*, 2013 WL 3991107, at *12 (citing *Pellerin v. Honeywell Int'l Inc.*, No. 11-1278, 2012 WL 112539 (S.D. Cal. Jan. 12, 2012) ("the disputed expert's knowledge of the moving party's confidential information posed a 'substantial risk [that the expert] may inadvertently use confidential information he is contractually barred from disclosing,' because 'the human brain does not compartmentalize information in that manner.'")

After finding an "identifiable impropriety," the court must also look to "'the traditional concerns of the legal profession that client confidences be protected and that appearances of professional impropriety be avoided.'" *DeBiasi v. Charter Cnty of Wayne*, 284 F. Supp. 2d 760, 770-71 (E.D. Mich. 2003). As applied to facts of this case, it is clear that when plaintiff's counsel deliberately retained Hilton's expert knowing that he *could* possess confidential information, they threw such traditional concerns to the curb in favor of a potential strategic advantage. *MMR/Wallace Power & Indus., Inc.*, 764 F. Supp. At 727 ("a prudent attorney would have inquired of plaintiff's counsel regarding their relationship with [plaintiff's counsel's ex-employee] prior to offering him a consulting contract"); *Shadow Traffic Network v. Super. Ct.*, 24 Cal. App. 4th 1067, 1081 n.10 (1994) (repeating admonition from an earlier case: "at the outset, plaintiff's lawyer should have clarified the situation with defense counsel before pursuing the matter with [the expert]. The prophylactic effect of such a small step, regardless of whether or not the expert has been retained as a consultant, is manifest.").Worse, when Hilton confronted plaintiff's counsel regarding the impropriety of Mr. Snyder's retention over a month ago, plaintiff's counsel refused to withdraw Mr. Snyder or to confirm that they would have no further contact with him. Such conduct undermines the public's trust and confidence in their use of experts, especially in those areas of litigation that are highly reliant on their services.

Where counsel have communicated with their adversary's consultants, courts have disqualified counsel on far less egregious facts than exist here. *See, e.g., Erickson v. Newmar Corp.*, 87 F.3d 298 (9th Cir. 1996) (remanding case to trial court for imposition of appropriate sanctions on defense counsel for his ethical violation in offering to employ plaintiff's retained expert witness in an unrelated matter prior to the witness's deposition); *Rentclub, Inc. v. Transamerica Rental Finance Corp.*, 811 F. Supp. 651 (M.D. Fla. 1992) (disqualifying firm that

retained former financial officer of opposing party as an expert witness), aff'd, 43 F.3d 1439 (11th Cir. 1995).

Based on the above, and based on the fact that the relationship between plaintiff's counsel and Mr. Snyder has become developed to the point that a preliminary report was prepared, the court should presume that confidential information had passed from Mr. Snyder to plaintiff's counsel, and that based on that presumption plaintiff's counsel should be disqualified from further participation in this action. That is the only just outcome.

### 3.     The Court May Apply Florida Law To Disqualify Plaintiff's Counsel

Just like the *Cordy* court, which acknowledged that it could apply both federal and state law to find disqualification of counsel, so too can the Court in this instance. When a court applies state law to a motion seeking disqualification of counsel on the basis of alleged unethical conduct, the moving party must clearly identify a specific Rule of Professional Conduct which is applicable to the relevant jurisdiction. *See Armor Screen Corp. v. Storm Catcher, Inc.*, 709 F.Supp.2d 1309, 1319 (2010).

The professional conduct of all members of the Florida Bar is governed by the model rules of professional conduct of the American Bar Association as modified and adopted by the Supreme Court of Florida. U.S. Dist. Ct., M.D. Fla. Loc. R. 2.04(c). "While the Code of Professional Conduct does not contain an express provision prohibiting the appearance of impropriety, Florida law clearly retains this requirement." *Rentclub, Inc.,* 811 F. Supp. At 654. In *State Farm Mutual Auto. Co. v. K.A.W., etc., et al.*, 575 So.2d 630, 633 (Fla. 1991), the Florida Supreme Court ruled that attorneys must still avoid even the appearance of professional impropriety. Here, plaintiff's counsel violated Florida Code of Professional Conduct Rule 4–1.6, which requires attorneys to maintain confidentiality and imposes upon attorneys a correlative

duty to refrain from *inducing others to disclose confidential matters*. They further violated Rule 4–4.2, which prohibits attorneys from directly communicating with adverse parties, including employees or former employees of the corporate parties represented by counsel. *See Rentclub*, 811 F. Supp. at 654.  They also violated Rule 4–8.4(d), which prohibits attorneys from engaging in conduct that is prejudicial to the administration of justice. Finally, they violated Rule 4-1.9(b), which provides "A lawyer who has formerly represented a client in a matter must not afterwards: (b) use information relating to the representation to the disadvantage of the former client except as these rules would permit or require with respect to a client or when the information has become generally known."

At best, plaintiff's counsel failed to take the reasonable and required step of contacting Hilton's counsel to determine whether Mr. Snyder had obtained confidential information relevant to this lawsuit. At worst, they deliberately and knowingly retained an expert under Hilton's employ and to whom Hilton has imparted confidential information directly material to its defense of this lawsuit. Under either scenario, plaintiff's counsel should be disqualified, as their continued participation in this lawsuit calls into question the fairness of the proceedings.

V.   <u>CONCLUSION</u>

For all of the foregoing reasons, Hilton respectfully requests that this Court disqualify Randall A. Snyder from further participation in this action; that he cease communications with either plaintiff, plaintiff's counsel, or any other person employed by plaintiff or her counsel regarding the above-captioned action; that plaintiff be precluded from using Mr. Snyder's report; and that plaintiff's counsel, Keogh Law, Ltd., and The Consumer Protection Firm, be

disqualified from representing plaintiff; and grant such other and further relief as justice may require.

Dated: April 24, 2017                    Respectfully submitted,


                                         */s/ Angela C. Agrusa*
                                         Angela C. Agrusa – TRIAL COUNSEL
                                         (*pro hac vice* pending)
                                         Liner LLP
                                         1100 Glendon Avenue, 14th Floor
                                         Los Angeles, CA 90024
                                         Tel. (310) 500-3500
                                         Fax (310) 500-3501
                                         aagrusa@linerlaw.com
                                         Counsel for Defendant


## **LOCAL RULE 3.1(j) REQUEST FOR ORAL ARGUMENT**

Pursuant to Local Rule 3.1(j), Middle District of Florida, Defendant requests oral argument on this Motion and estimates the time required for both sides to make their presentation to be one-half hour.

Dated: April 24, 2017                    Respectfully submitted,


                                         */s/ Angela C. Agrusa*
                                         Angela C. Agrusa – TRIAL COUNSEL
                                         (*pro hac vice* pending)
                                         Liner LLP
                                         1100 Glendon Avenue, 14th Floor
                                         Los Angeles, CA 90024
                                         Tel. (310) 500-3500
                                         Fax (310) 500-3501
                                         aagrusa@linerlaw.com
                                         Counsel for Defendant

## CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 3.01(g)

I certify that on April 21, 2017 I met and conferred with counsel for plaintiff regarding the substance of this motion. Plaintiff's counsel indicated that plaintiff will oppose this motion.

Dated: April 24, 2017                    Respectfully submitted,


*/s/ David B. Farkas*
David B. Farkas, Esq.


## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF on this 24th day of April, 2017. I also certify that the foregoing document is being served this day on all counsel of record identified on the Service List via transmission of Notice of Electronic Filing generated by CM/ECF.


*/s/ Angela C. Agrusa*
Attorney

## SERVICE LIST

William Peerce Howard
  billy@theconsumerprotectionfirm.com
Amanda J. Allen
  amanda@theconsumerprotectionfirm.com
The Consumer Protection Firm
210-A South MacDill Ave.
Tampa, Florida 33609
Tel.: 813.500.1500

Tim J. Sostrin (admitted *pro hac vice*)
  tsostrin@keoghlaw.com
Keogh Law, Ltd.
55 West Monroe Street, Suite 3390
Chicago, Illinois 60603
Tel.: 312.374.3405