**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| MELANIE GLASSER, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>HILTON GRAND VACATIONS COMPANY, LLC,<br><br>Defendant. | CIVIL ACTION NO.<br>8:16-cv-00952-JDW-AAS |

**P**LAINTIFF'S **O**PPOSITION TO **D**EFENDANT'S **M**OTION FOR **S**UMMARY **J**UDGMENT

Plaintiff Melanie Glasser opposes the Motion for Summary Judgment (Doc. 98) filed by defendant Hilton Grand Vacations Company, LLC ("HGV") for the following reasons:

**I. Introduction**

In less than six months, HGV used the Intelligent Mobile Connect ("IMC") dialing system to place fifteen million nine hundred thousand (15,900,000) timeshare telemarketing calls in violation of the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227, including thirteen (13) such calls to Plaintiff's cellular telephone number.  Each one of these telephone calls was automatically dialed by software in a computer server, from a list of telephone numbers.  No human being was on the phone when the calls were dialed and no human being was on the phone when the calls were answered.  Rather, the computer itself automatically dialed each number, detected whether or not the call was answered, and if so, attempted to transfer the call to an HGV Sales Agent.

HGV purposely implemented this system to falsely appear as if it was not an Automatic Telephone Dialing System ("ATDS") and now argues that it is entitled to summary judgment.

1

Specifically, HGV claims that the system lacks "the capacity to dial telephone numbers without human intervention" because calls were "manually dialed" by human beings ("MDM Agent" or "Clicker Agent")[1] in Orlando, Florida who clicked a button on a computer application ("Desktop Application" or "Console"). HGV is wrong both on the facts and the law.

First, even HGV's own expert admits that the button does not dial telephone numbers. In fact, the Desktop Application used by the Clicker Agents has no telephony functionality whatsoever; it simply cannot be used to place or participate in telephone calls. Rather, the Clicker Agents collectively use the Desktop Application to create a list of telephone numbers that are automatically dialed by a computer server hundreds of miles away in Florence, Kentucky. Multiple clicker agents click the button in rapid succession, each time submitting another number to the list, and the computer server automatically dials each number proceeding through the list. **No human being is on the phone when the numbers are dialed.** HGV's charade does not entitle it to judgment; it is evidence it willfully violated the TCPA.

Second, the capacity to dial telephone numbers without human intervention is only a factor in the analysis; it is not the *sine qua non* of an ATDS. *Keim v. ADF Midatlantic, LLC*, 2015 U.S. Dist. LEXIS 159070, *12 (S.D. Fla. 2015) ("equipment may be an autodialer despite the fact that it does not have the capacity to dial numbers without human intervention.") As HGV concedes, "predictive dialers qualify as ATDS systems[.]" *Patterson v. Ally Fin., Inc.*, 2018 U.S. Dist. LEXIS 15203, *3-4 (M.D. Fla. 2018) citing *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1114 (11th Cir. 2014). The IMC System is a Predictive Dialer.

---

[1] As explained throughout, these Clicker Agents are distinct from the Sales Agents who actually participate in the telephone calls if the computer detects an answer. The Clicker Agents do not dial or otherwise participate in any telephone calls.

Thus, regardless of how any "human intervention" in the IMC system is characterized, the IMC System is an ATDS because it is a Predictive Dialer.

At the very least, there is a genuine dispute of material fact as to whether the IMC System is an ATDS. HGV's motion for summary judgment should therefore be denied.

## II. Standard on Summary Judgment

HGV must show that there "is no genuine dispute as to any material fact and that [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. When ruling on a motion for summary judgment, the court must "draw all inferences and review all evidence in the light most favorable to the non-moving party." *Mais*, 768 F.3d at 1119 (vacating summary judgment granted to defendant in TCPA case).

Courts "may not decide a genuine factual dispute at the summary judgment stage." *Scott v. Sarasota Doctors Hosp., Inc.*, 145 F. Supp. 3d 1114, 1123 (M.D. Fla. 2015), citing *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." *Id.*, citing *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

## III. Regulatory Background for ATDS

Congress enacted the TCPA in 1991, placing "restrictions on the use of automated telephone equipment" in order address "the proliferation of intrusive, nuisance calls . . . from telemarketers." 47 U.S.C. §227(b); 105 Stat. 2394-95, at § 2(6). At that time, telemarketers primarily used equipment that dialed random or sequential blocks of telephone numbers. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014, 14092 (2003) ("2003 Order"). Thus, the TCPA defined an ATDS as "equipment

which has the capacity - (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). Congress, however, "anticipated that the FCC might need to consider changes in technology." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd 559, 566, n.48 (2008) ("2008 Order"). As stated by Senator Hollings during enactment, "the FCC is not limited to considering existing technologies. The FCC is given the flexibility to consider what rules should apply to future technologies as well as existing technologies." 137 Cong. Rec. S18784 (daily ed. Nov. 27, 1991).

Pursuant to the authority granted by Congress, the FCC has repeatedly held[2] that the ATDS prohibitions apply to new technologies used by telemarketers, such as Predictive Dialers, wherein computer systems automatically dial telephone numbers *from a list* instead of generating random or sequential blocks of telephone numbers. *See 2003 Order*, 18 FCC Rcd. at 14090-93; *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* 19 FCC Rcd. 19215, 19215, n. 1 (2004) ("2004 Order"); *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* 20 FCC Rcd. 3788, ¶ 5 (2005) ("2005 Order"); *2008 Order*, 23 FCC Rcd at 566-67; *In re Rules and Regulations Implementing the Telephone Consumer Protection Act*, 27 FCC Rcd. 1830. 1835, n. 31 (2012) ("2012 Order"); *In re Rules and Regulations Implementing the Telephone Consumer Protection Act*, 30 FCC Rcd 7961, 7971-78 (2015) ("2015 Order).[3]

---

[2] The FCC's TCPA rulings are binding on this court pursuant to the Hobbs Act, which limits jurisdiction for the review of FCC orders to direct appeals to Circuit Court of Appeals. *Mais*, 768 F.3d at 1121 (holding that "the district court was without jurisdiction to consider the wisdom and efficacy of the 2008 FCC Ruling.")

[3] The D.C. Circuit recently set aside certain portions of the 2015 Order under the Administrative Procedure Act in *ACA Int'l v. FCC*, 2018 U.S. App. LEXIS 6535 (D.C. Cir. 2018). Contrary to HGV's assertions, Plaintiff

The FCC first sought to address such list-based systems in 2002, when it issued a Notice of Proposed Rule Making seeking comment on

> "new technologies [that] have emerged to assist telemarketers in dialing the telephone numbers of potential customers. More sophisticated dialing systems, such as predictive dialers and other electronic hardware and software containing databases of telephone numbers, are now widely used by telemarketers to increase productivity and lower costs." *Rules and Regulations Implementing the Telephone Consumer Protection Act*, 17 FCC Rcd 17459, 17474, (2002) ("2002 NPRM").

After considering industry and consumer comments, the FCC ordered as follows:

> "The statutory definition contemplates autodialing equipment that either stores or produces numbers. It is clear from the statutory language and the legislative history that Congress anticipated that the FCC, under its TCPA rulemaking authority, might need to consider changes in technologies. In the past, telemarketers may have used dialing equipment to create and dial 10-digit telephone numbers arbitrarily. As one commenter points out, the evolution of the teleservices industry has progressed to the point where using lists of numbers is far more cost effective. The basic function of such equipment, however, has not changed--the capacity to dial numbers without human intervention. We fully expect automated dialing technology to continue to develop.
> ….[T]o exclude from these restrictions equipment that use predictive dialing software from the definition of 'automated telephone dialing equipment' simply because it relies on a given set of numbers would lead to an unintended result . . . We believe the purpose of the requirement that equipment have the 'capacity to store or produce telephone numbers to be called' is to ensure that the prohibition on autodialed calls not be circumvented." *See 2003 Order*, 18 FCC Rcd. at 14090-93

The FCC has since repeatedly affirmed that list-based dialing systems, such as predictive dialers, are ATDSs. *See 2004 Order*, 19 FCC Rcd. at 19215, n.1; *2008 Order*, 23 FCC Rcd. at 566; *2012 Order*, 27 FCC Rcd. at 1850.

Thus, "a dialer need not have a random or sequential number generator to qualify as an ATDS . . . the TCPA was intended to protect against autodialed calls, including calls from a list of numbers." *Smith v. MarkOne Fin., LLC*, 2015 U.S. Dist. LEXIS 11803, *8 (M.D. Fla.

---

does not rely on the *2015 Order* to establish that the IMC System is an ATDS, but rather well developed case law from the 11th Circuit and FCC orders going all the way back to 2003.

2015). "Courts have found equipment to qualify as an ATDS if it can dial numbers automatically, for example by calling or sending text messages to numbers in a pre-programmed list, irrespective of the presence of a random or sequential number generator." *Legg v. Voice Media Group, Inc.*, 20 F. Supp. 3d 1370, 1375 (S.D. Fla. 2014).

As the FCC has explained, the basic functions of an ATDS are "the *capacity* to dial telephone numbers without human intervention" and the ability to "dial thousands of numbers in a short period of time[.]" *2003 Order*, 18 FCC Rcd. at 14092-93 (original emphasis)); *Gulisano v. Cambece Law Office, PC*, 2016 U.S. Dist. LEXIS 184129, *9 (S.D. Fla. 2016) (that defendant "places hundreds of thousands of telephone calls on an annual basis is evidence suggestive of the use of an ATDS to accomplish such a high call volume.")

Although these considerations factor into the equation, there is no human intervention test *per se*. *See Keim*, 2015 U.S. Dist. LEXIS 159070 at *16. For instance, predictive dialers, which dial telephone numbers while no human being is on the phone "in a manner that 'predicts' the time when a consumer will answer the phone and a telemarketer will be available to take the call" (*2012 Order*, 27 FCC Rcd. at 1835, n. 31), *categorically* qualify as ATDSs under the statute. *See Mais*, 768 F.3d at 1114 ("a predictive dialer falls within the meaning and statutory definition of [ATDS] and the intent of Congress"); *Strauss v. CBE Group, Inc.*, 173 F. Supp. 3d 1302 (S.D. Fla. 2016) ("A predictive dialer is clearly an ATDS within the meaning of the TCPA"); *Estrella v. LTD Fin. Servs., LP*, 2015 U.S. Dist. LEXIS 148249, *4 (M.D. Fla. 2015) (same); *Keim*, 2015 U.S. Dist. LEXIS 159070, *6. Similarly, courts have rejected arguments that systems are not predictive dialers simply because humans uploaded the lists before the system automatically dialed them. *See id.* at *22; *infra*.

**IV. Additional Material Facts**

1. HGV is a "marketing driven business" that engages in "telemarketing" campaigns to sell timeshares to marketing "leads." *Ex 1* at 20:10-20, 24:3-15, 35:18-36:9; *Ex. 2* at p. 1.

2. HGV stores all of the contact information for these leads in an electronic database called the "marketing data warehouse," including their names, phone numbers, and extensive demographic information (such as the leads' income level and racial background), among other things. *Ex. 1* at 32:11-21, 33:16 – 34:6, 34:20-22; 54:18-25; 55:14-19; *Ex. 2* at pp. 9-12.

3. Between October 16, 2013 and April 2, 2014, HGV used the IMC System, designed by its vendor Interactive Intelligence, Inc., to dial the cellular telephone numbers of the marketing leads in its marketing database. *See HGV's Fact #2*; *Ex. 1* at 105:2 – 106:21.

4. The IMC system is comprised of multiple computer servers, specialized software, computer databases, networking hardware, and internet signaling protocols operating together at various locations across the United States. *Ex. 3* at ¶ 34; *Ex. 4* at 30:14 – 31:9; *Ex. 5*.

5. Except for a single Desktop Application described below, the IMC System includes the same hardware and software components utilized in other automated dialing systems designed by Interactive Intelligence, including its core software component - the Customer Interaction Center (CIC). *Ex. 4* at 20:12 – 25:8, 66:2-12; *Ex. 5*; *Ex. 6* at pp. 7-8; *Ex. 7*; *Ex. 8* at p. 1.

6. For the IMC System, HGV's computer software was programmed to once a week generate a telemarketing campaign by pulling a list of telephone numbers from the marketing database, sorting and filtering that list, and then storing the resulting list of numbers in a separate "I3" database utilized by the IMC system. *Ex. 1* at 16:5-24; 71:8-12; 105:2 – 106:21.

7. The I3 database that stores the list of telephone numbers to be called is housed on a

computer server in HGV's Florence, Kentucky data center, and links directly to another computer server at that same data center, the "CIC Server Outbound TCPA," which hosts software that automatically dials the telephone numbers. *Ex. 1* at 112:20 – 113:3; *Ex. 4* at 47:22 – 48:23; *Ex. 5*; *Ex. 6* at p. 12; *Ex. 9* at 67:10-23.

8. Software in the CIC Server pulls the telephone numbers from the I3 database and populates those telephone numbers into the view screens of the IMC Desktop Application used by HGV's MDM or "clicker" agents. *Ex. 3* at ¶ 44; *Ex. 1* at 105:2 – 106:21; *Ex. 4* at 67:15 – 68:20, 126:16-127:13; *Ex. 6* at p. 12; *Ex. 9* at 69:3 – 71:6.

9. All of the clicker agents operated the Desktop Application from a single HGV office in Orlando, Florida, hundreds of miles from where the telephone numbers are actually dialed. *Ex. 1* at 111:22 – 112:10, 148:3-8; *Ex. 10*.

10. In order to create the dialing list, multiple Clicker Agents employed by HGV rapidly and repeatedly click the misleadingly named "make call" button in the Desktop Application to pass those telephone numbers *back to the same CIC Server* in Florence, Kentucky, generating a queue of telephone numbers that will later be automatically dialed by software in the Server. *Ex. 3* at ¶¶ 48, 54-55, 59, 73-74, 79, 81; *Ex. 4* at 75:9-14, 77:1 – 78:6; *Ex. 6* at p. 12; *Ex. 9* at 23:19-21, 56:16 – 57:13, 70:23 – 71:4; *Ex. 11* at 152:2 – 153:5; *Ex. 12* at p. 7.

11. The clicker agents who use the Desktop Application do not make, dial or otherwise participate in any phone calls; they are not on a telephone, and have no ability to dial, speak or listen to the call, cancel the call, or even hang up the phone. *Ex. 1* at 78:18-25; *Ex. 3* at ¶¶ 45, 63, 75-77; *Ex. 4* at 72:10-17, 73:19-24, 74:1-3; *Ex. 9* at 56:6-21.

12. In fact, the IMC desktop application has no telephony functionality whatsoever; it is

impossible to use the Desktop Application to dial a telephone number or participate in a telephone call. *Ex. 3* at ¶¶ 75 – 76; *Ex. 9* at 56:6-21.

13. Together, the clicker agents generate a list, or queue, of telephone numbers in the CIC Server by rapidly and repeatedly clicking the "make call" button. *Ex. 3* at ¶¶ 48, 54-55, 59, 73-74, 79, 81; *Ex. 11* at 152:2 – 153:5.

14. The clicker agents have no discretion about which telephone numbers to pass back to the CIC Server. They cannot skip, cancel, or change the phone number that is populated into the application; they must either click the button to submit the prepopulated number into the dialer queue, or cease clicking altogether. *Ex. 3* at ¶ 44; *Ex. 4* at 133:23 – 134:6.

15. The IMC system employs Session Initiation Protocol ("SIP") signaling technology to dial the telephone calls. *Ex. 3* at ¶ 54; *Ex. 6* at p. 3; *Ex. 9* at 23:3-11.

16. In SIP, the "User Agent" function is the signaling function that dials telephone calls through the generation of "invite requests". *Ex. 3* at ¶¶ 16-20, 55; *Ex. 19* at p. 32 ("the user agent initiating a call acts as a UAC when sending the initial INVITE request"), *id.* ("if a piece of software initiates a request, it acts as a UAC for the duration of that transaction").

17. In the IMC system, this SIP User Agent dialing function resides solely in software operating in the CIC Server. *Ex. 3* at ¶ 55; *Ex. 4* at 37:11-19; *Ex 5*.

18. That software, the Ipa_IMC_DialRecord.ihd "handler" subroutine, automatically dials telephone numbers from the queue of telephone numbers previously submitted into the server by automatically generating a SIP invite request for each telephone number as it progresses through the queue. *Ex. 3* at ¶¶ 48, 54-55, 73-74, 79, 81; *Ex. 4* at 75:9-14, 77:1 – 78:6; *Ex. 6* at p. 12; *Ex. 9* at 23:19-21, 56:16 – 57:13, 70:23 – 71:4; *Ex. 11* at 152:2 – 153:5; *Ex. 12* at p. 7.

19. When that software in the CIC Server dials a telephone number, no human being is on the telephone and there is no human being taking part in the call; rather, the software itself both dials the telephone number and begins "call progress analysis." *Ex.1* at 113:13 - 114:13; *Ex. 3* at ¶ 62; *Ex. 4* at 43:27-44:10, 46:6-23; *Ex. 9* at 56:6 - 57:13.

20. In this "call progress analysis," the software detects whether the call attempt results in a successful connection, detects whether a connected call is answered by voicemail or by a person, and if answered by a person, then attempts to transfer the already connected call to an HGV Sales Agent. No human being is involved in any step of this process. *Ex. 1* at 148:21 – 149:19; *Ex. 3* at ¶ 62; *Ex. 4* at 43:27-44:10, 46:6-23; *Ex. 9* at 92:18 – 93:1; *Ex. 13* at p. 2

21. The call progress analysis software records the results of its call attempts into a database, including "Connected," when it successfully transfers the call to an HGV Sales Agent after answer; "Not Reached," when it detects that there is no dial tone; and "No Lines" when it detects that there are no lines available to dial, meaning no telephone number was ever dialed for that call attempt despite the prior clicking of the so-called "make call" button. *Ex. 1* at 97:4-11, 115:13-25, 129:13 – 131:11; *Ex. 3* at ¶ 52; *Ex. 4* at 89:20 – 90:17; *Ex. 14* at p. 15.

22. If no Sales Agents are available upon answer, the called party hears "dead air," leading to a delay or "abandon" of the call. *Ex. 3* at ¶ 61; *Ex. 4* at 98:20 – 101:20; *Ex. 15* at p.1, § 2.

23. The IMC system has a configurable setting to control this abandon rate, called the "IMC Limit," regulating the number of calls dialed by the software based on the number of calls in progress and available sales agents. *Ex. 3* at ¶ 58; *Ex. 4* at 98:20 – 101:20; *Ex. 14* at p. 14.

24. The maximum configurable IMC limit is 100 calls per available sales agent, and allows for 1,000 simultaneous calls when configured to this setting. *Ex. 3* at ¶ 58; *Ex. 14* at p. 14.

25. Between October 16, 2013 and April 2, 2014, the IMC system was configured to place four calls for every available sales agent. *Ex. 1* at 148:21 – 149:19; *Ex. 13* at pp. 2-3.

26. Analysis of HGV's call records show that between January 3, 2014 and January 15, 2014, the IMC system placed calls at a rate of 2-3 calls per second. *Ex. 3* at ¶ 69.

27. This rate is consistent with the dialing rates of other predictive dialing systems. *Id.*

28. Technical manuals for the IMC system show that a computer, not a human being, dials telephone numbers in the IMC system. *Ex. 14* at p. 12 (the "system will attempt to dial any valid phone number on a record (based on timezone) in order of priority (desc)."); *id.* ("the system will only dial when ALL of those timezones are safe to dial"); *id.* ("it will only dial this phone number when EDT and CDT can be safely dialed").

29. Marketing materials also promoted the predictive dialing capabilities of the IMC system. *Ex. 8* at p. 1 (promoting capacity to "place numerous and continual outbound calls – enough to statistically result in right party contacts for the number of available agents.")

30. Nevertheless, in order to create the illusion that it is not an autodialer, demo guidelines for the IMC system prohibited referring to the system as a dialer. *Ex. 4* at 74:15-24; *Ex. 16* at pp. 1-3. ("NEVER, NEVER, NEVER refer to this solution as a "Dialer" or 'auto-dialer" during the demo."); ("Explain that in this demo no dialer is used and if implemented no dialer will be installed. **This is critical for customers who need to be able to go in front of a judge and say they do not even own an auto-dialer**.") (emphasis added).

31. HGV employed similar tactics, requiring its Sales Agents to promise, subject to disciplinary action, "that from today and going forward I will not refer to the [IMC system] as an automated system or dialer. Manual or Manual Call Campaign are the only acceptable

terms used to describe our call center operations." *Ex. 1* at 145:24 – 146:23; *Ex. 10*.

32. HGV also required its Sales Agents to lie to persons complaining about the "dead air" resulting from the calls by representing that the delay was the result of a human being transferring the call to the sales agent, rather than an autodialer delay. *Ex. 10*.

33. Between October 16, 2013 and April 2, 2014, HGV used the IMC System to place fifteen million nine hundred thousand (15,900,000) calls, including thirteen (13) such calls to Plaintiff's cellular telephone number. *Ex. 1* at 162:14-22; *Ex. 17* at ¶¶ 4-7; *Exhibit 18*.

34. HGV stopped using the IMC system in December 2015. *Ex. 1* at 81:11-12.

35. After it ceased using the IMC system, HGV switched to a true manual dialing system wherein HGV's sales agents themselves use a telephone to dial a single telephone number, then speak to whomever they just called, and then complete that call before dialing a different telephone number. *Ex. 1* at 161:11 – 162:10.

**V. Response to HGV's Statement of Facts**

**1**. The phone calls that plaintiff alleges violated the TCPA were placed between October 16, 2013 and April 2, 2014. **Admitted.**

**2.** Hilton exclusively used the Intelligent Mobile Connect system to place calls to cellular telephone numbers between October 16, 2013 and April 2, 2014. **Admitted.**

**3**. The IMC system was designed to be incapable of automatically dialing any telephone numbers, and does not have the capacity to automatically dial any telephone numbers.

    **Denied.** Every single call in the IMC System is automatically dialed by computer software from a queue of telephone numbers. *See Additional Material Facts (AMF) 10-19*.

**4.** The IMC system is entirely separate and distinct from the systems Hilton used to place calls to landlines at both the hardware and software levels. The IMC system uses its own unique combination of hardware and software that is not shared with any other dialing system.

    **Denied.** The IMC system shares numerous components with Hilton's other dialing

12

systems. *See AMF 4-5.*

**5.** The IMC System is a human initiated and human controlled dialing system that requires a Hilton agent to manually initiate every call.

    **Denied.** Every single call in the system is automatically dialed by computer software from a queue of telephone numbers while no human being is on the phone. *See AMF 10-19.*

**6.** The IMC System requires human intervention to place each and every single telephone call, and it is incapable of dialing a single telephone call without human intervention.

    **Denied.** Every single call in the system is automatically dialed by computer software from a queue of telephone numbers while no human being is on the phone. *See AMF 10-19.*

**7.** When a Hilton representative intends to make a call though the IMC System, the telephone number to be dialed is presented to a human agent, called the Manual Dialing Marketing ("MDM") agent.

    **Denied.** All telephone numbers passing through the IMC Desktop Applications are auto-populated into the IMC desktop applications from a computer generated campaign list of marketing leads. *See AMF 6-8.* Further, MDM agents do not make or participate in telephone calls; the Desktop Application has no telephony functionality whatsoever. *AMF 11-12.*

**8.** The MDM agent is responsible for confirming that the number to be called is the correct number, and after doing so, launching the call by physically clicking on a "Make Call" button.

    **Denied.** The clicker agents do not have the ability to confirm whether or not telephone numbers are "correct" before submitting those numbers to the dialer queue. *AMF 14.* Further, the "'Make Call' button" does not launch a call or dial a telephone number. *AMF* 10-19.

**9.** When any Hilton representative uses the IMC System, he or she must click on a dialogue box to confirm the launching of a call to a particular telephone number. The call cannot be launched unless the clicker agent clicks on the "Make Call" button in the dialogue box.

    **Denied.** The button does not launch a call or dial a telephone number. *AMF* 10-19.

**10.** The IMC System is designed such that the MDM Agents manually initiate calls to Hilton

customers, and the calls are then transferred to selling agents who speak with customers and offer targeted discounted vacation packages.

**Denied**. The MDM Agents do not initiate calls or transfer calls to the sales agents. Instead, a computer automatically dials the calls while no human being is on the telephone, and the computer transfers those calls to HGV's Sales Agents. *AMF 19-22*.

**11.** The IMC System is not a predictive dialer or an ATDS since human intervention is required at the point in time at which the number is dialed.

**Denied.** Whether the IMC System is an ATDS is a legal conclusion, which Plaintiff affirmatively demonstrates throughout this brief. The IMC System *is* a predictive dialer. *See AMF 19-29*. Further, human intervention is not only not required at the point in time at which the number is dialed, it is not possible as the number is dialed later. *See AMF 15-19*.

**12.** The IMC System does not have the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, and to dial such numbers.

**Denied.** This "statement of fact" is nothing more than a recitation of the statutory definition of an ATDS and thus asserts a legal conclusion. The IMC System is an ATDS as demonstrated throughout this brief. It is a predictive dialer that both stores and produces telephone numbers to be called by generating telemarketing campaign lists and automatically dials those telephone numbers without human intervention. *See AMF 6-14*.

## VI. Argument

HGV's motion should be denied because 1) the IMC System is an ATDS since it is predictive dialer and 2) HGV's charade that the IMC System cannot dial telephone numbers without human intervention is false.

### A. The IMC System is a Predictive Dialer

HGV concedes that a predictive dialer is an ATDS. *See Doc. 98 – Motion* at pp.7 (n.2.),

8, 22. Further, this Court has already held that "the definition of ATDS includes predictive dialers." *Estrella*, 2015 U.S. Dist. LEXIS 148249 at *4.

"A predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls." *2003 Order*, 18 FCC Rcd. at 14091. "[P]redictive dialers store pre-programmed numbers or receive numbers from a computer database and then dial those numbers in a manner that maximizes efficiencies for call centers." *Id.* "[T]elemarketers program the numbers to be called into the equipment, after which the dialer calls the numbers at a rate to ensure that when a consumer answers the phone, a sales person is available to take the call." *Brown v. NRA Group, LLC*, 2015 U.S. Dist. LEXIS 73065, * 5 (M.D. Fla. 2015).

"Using a predictive dialer allows a telemarketer's sales agents to remain on the phone perpetually without any dialing or other down time, and provides an extremely cost-effective way of doing business. *Mainstream Mktg. Servs. v. FTC*, 283 F. Supp. 2d 1151, 1169 (D. Colo. 2003). "The use of predictive dialers, however, often results in calls being 'abandoned,' when a sales agent is not available to transfer to the new call and the customer answering the telephone hears 'dead air.'" *Id.* As the 11th Circuit has recognized, "using predictive dialers allows telemarketers to devote more time to selling products and services rather than dialing phone numbers, but the practice inconveniences and aggravates consumers who are hung up on." *Mais*, 768 F.3d at 1114, citing *2003 Order* at 14022.

These abandons or "dead air" are the "signature of autodialing." *De Los Santos v. Millward Brown, Inc.*, 2014 U.S. Dist. LEXIS 88711, *9-10 (S.D. Fla. 2014). They are "highly indicative of the use of an ATDS." *Gulisano*, 2016 U.S. Dist. LEXIS 184129 at *9; *Rinehart*

*v, Diversified Cent., Inc.*, 2018 U.S. Dist. LEXIS 5141, *21 (N.D. Ala. 2018) (same).

This is exactly how the IMC System operates and how it was able to dial almost sixteen million calls in less than six months. It receives numbers stored in the I3 database (*AMF* 6-10) and utilizes software that assists HGV in predicting when a Sales Agent will be available to take the calls (*AMF* 23-25, 29). It dials more telephone calls than there are agents available to speak on the phone, up to 100 calls per available agent, and thus often results in "dead air" or abandoned calls. *AMF* 20-22. This "abandon rate" is even configurable in the IMC software. *AMF* 23-25. Thus, the IMC System is a predictive dialer. *Ex. 3* at ¶¶ 28, 79.

### B. The IMC System Dials Telephone Numbers Without Human Intervention

Given that predictive dialers categorically qualify as ATDSs, there is no *per se* human intervention test; it is rather a factor in the Court's analysis. *See Keim*, 2015 U.S. Dist. LEXIS 159070 at *16. Even HGV's own cited authorities hold that "the primary consideration" on this issue is "whether human intervention is <u>required at the point in time at which the number is dialed</u>." *Doc. 98* at pp 7, 9, citing *Brown*, 2015 U.S. Dist. LEXIS 73065, *6 (emphasis added); *see also Strauss*, 173 F. Supp. 3d at 1310 (human intervention must be "essential at the point and time that the number is dialed").

Thus, a dialing system may be an ATDS if "human involvement is in fact unnecessary <u>at the precise point of action barred by the TCPA</u>," i.e., dialing of the telephone number. *Blow v. Bijora, Inc.*, 855 F.3d 793, 802 (7th Cir. 2017) (emphasis added). "[T]he proper inquiry revolves around whether there is any human intervention at the time a number is actually dialed, not simply before a call is placed and where a given set of numbers is entered." *Daubert v. NRA Group, L.L.C.*, 189 F. Supp. 3d 442, 463 (M.D. Pa. 2016) (reversed on other grounds)

"Courts have [therefore] rejected the argument that the amount of human intervention involved in merely entering a customer's telephone numbers into an electronic database removes the equipment from the definition of an ATDS" *Zeidel v. A&M (2015) LLC*, 2017 U.S. Dist. LEXIS 48024, *32-33 (N.D. Ill. 2014).  Courts "do[] not inquire as to whether there is human intervention at the entering of a 'given set of numbers' or programming of the computer system[.]" *Id.*, citing *Morse v. Allied Interstate, LLC*, 65 F. Supp. 3d 407, 410 (M.D. Pa. 2014).  Indeed, this level of human intervention exists in all list-based automatic dialing systems because human intervention is always required to create the list of numbers to be dialed.  Such human intervention in the "uploading of call lists" does not exempt the system from the TCPA's telemarketing rules. *Keim*, 2015 U.S. Dist. LEXIS 159070 at *22; *see also In re Collecto, Inc.*, 2016 U.S. Dist. LEXIS 16319, *13, n. 9 (D. Mass. 2016) (rejecting defendant's human intervention argument and distinguishing cases where "human intervention was required to *dial* the target telephones, not simply to activate the process (by assembling a list of numbers and uploading them to the dialer).") (original emphasis).

HGV has attempted to conceal these facts under the guise of the so-called "make call" button, but that is precisely what the clicker agents do when they click on the Desktop Application.  Even HGV's own expert admits that the button does not actually dial telephone numbers. *Ex. 9* at 23:19-21, 56:16 – 57:13, 70:23 – 71:4.  The Desktop Application in fact has no telephony functionality whatsoever. *AMF* 12.  All the clicker agents do is pass telephone numbers back to CIC Server, thus generating a queue of telephone numbers that will later be automatically dialed by software in the CIC Server. *AMF* 10.  With multiple clicker agents repeatedly clicking the button to submit numbers to the dialer queue, the button serves the

same function as uploading a list of telephone numbers in other automated dialers; the only difference being that the telephone numbers are entered into the system in rapid succession by multiple clicker agents rather than all at once by loading a single file into the system. *Ex. 3* at ¶¶ 59, 74; *Ex. 11* at 115-16, 152.

This indiscriminate clicking activity does not shield HGV from the TCPA. *Keim*, 2015 U.S. Dist. LEXIS 159070 at *22 ("Even before the FCC issued its 2015 Order, courts deemed such 'human intervention' insufficient to preclude TCPA liability"), citing *Sterk v. Path, Inc.*, 46 F. Supp. 3d 813, 819 (N.D. Ill. 2014) ("The uploading of call lists from Path users is essentially the same as when a call list is entered by a telemarketer in a database. It is the ultimate calling from the list by the automated equipment that is the violation of the TCPA.")

### a. This Court's Opinion in *Estrella* is Inapposite

*HGV* relies on this Court's decision in *Estrella*, 2015 U.S. Dist. LEXIS 148249, which found that the click to dial system used in that case was not an ATDS. Yet that case is markedly distinguishable. In *Estrella*, there was <u>no evidence</u> submitted by the plaintiff regarding the "point and click" dialing system at issue. As the *Estrella* court held, plaintiff's only submission regarding the dialing system was a single "unsworn declaration" stating that "he 'could tell' Defendant was using an ATDS to call him because when he answered there was 'a prolonged silence' and what he would describe as 'delays and clicks.'" *Id.* at *7. Here, on the other hand, there is extensive testimony from both HGV and the manufacturer of the IMC system, technical manuals, and expert testimony from both Plaintiff's expert as well as Hilton's expert who agree that humans are not dialing the numbers. *Estrella* is thus of little import to this case.

Similarly, the *Pozo* decision and others addressing the completely separate HCI dialing

18

system are inapposite because that system "required human intervention to make and route each call", yet it is undisputed in this case that a computer, not a human being, actually dials *and routes* each call placed through the IMC system. *AMF* 18-22; *see also Pozo v. Stellar Recovery Collection Agency, Inc.*, 2016 U.S. Dist. LEXIS 146432, *13 ("the systems in *Echevvaria* and *Davis* were predictive dialers because they automatically called numbers from a list and automatically connected the calls with an available agent.")

### b. HGV Misrepresents Mr. Snyder's Testimony from the *Connelly* Action

Finally, HGV misleadingly portrays Plaintiff's expert's testimony in the prior Connelly action,[4] which concerned a different dialing system used by HGV in the past (the Liberation system) that also utilized a button clicker. What HGV fails to acknowledge, however, is Mr. Snyder's testimony that, unlike the IMC System, the button in the system at issue in Connelly *actually dialed a telephone number*. The persons who clicked that button were using an application that had telephony functions; they were actually on a telephone and would speak to the persons that they called. *Ex. 11* at 50:8 – 51:22, 135:1-17, 140:24 – 142:1. Thus, there is no comparison to the IMC System at issue in this case.

After HGV ceased using the IMC system, it switched to a true manual dialing system like that at issue in Connelly, wherein its sales agents used a telephone to dial a single telephone number, then speak to whomever they just called, and then complete that call before dialing a different telephone number. *AMF* 35. HGV knew that the IMC system was different and functionally indistinguishable from any other ATDS. That is why it took extraordinary efforts

---

[4] This testimony from a prior action, in which neither Plainitff nor her counsel were involved, is inadmissible hearsay. Fed. R. Evid. 801(c). Similarly, HGV's Exhibit E (attached to Farkas dec) is also hearsay. It is a document created for the purpose of this litigation, and particularly, to coach the witness on what to say during the deposition. It is not a business record and no other hearsay exception applies. *Ex. 4* at 122:18 – 124:7.

to convince its own employees that it was not an automated system, even requiring Sales Agents to lie to consumers about the reason for the "dead air" (*AMF* 32) and to promise, subject to disciplinary action, "that from today and going forward I will not refer to the [IMC system] as an automated system or dialer. Manual or Manual Call Campaign are the only acceptable terms used to describe our call center operations." *AMF* 31-32.

The FCC has repeatedly held that callers cannot circumvent the TCPA's prohibitions by making superficial alterations to dialing technology that leave intact the core, automated functionality. *See 2003 Order*, 18 FCC Rcd. at 14093; *2015 Order*, 30 FCC Rcd. 7961. That is exactly what HGV attempted to do here. The Court should deny HGV's motion.

Respectfully Submitted,

/s/ Timothy J. Sostrin
Timothy J. Sostrin (*pro hac vice*)
Keith Keogh
KEOGH LAW, LTD
55 W. Monroe St, Suite 3390
Chicago, IL 60603
312-726-1092
312-726-1093 (fax)
Keith@Keoghlaw.com
TSostrin@KeoghLaw.com

William Peerce Howard (FBN 0103330)
Amanda J. Allen (FBN 098288)
THE CONSUMER PROTECTION FIRM
TheConsumerProtectionFirm.com
210 A-South MacDill Ave.
Tampa, Florida  33609
Telephone:  (813) 500-1500
Billy@TheConsumerProtectionFirm.com
Amanda@TheConsumerProtectionFirm.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 30, 2018, I electronically filed the foregoing Response to HGV's Motion for Summary Judgment with the Clerk of the Court by using the CM/ECF system, who will send a notice of electronic filing to all counsel of record.

By: s/ Timothy J. Sostrin

Counsel for Plaintiff